## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **MALINDA WILSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Case number 4:09cv1468 TCM** |
| | ) |
| **MICHAEL J. ASTRUE,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Malinda Wilson's applications for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income benefits (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the Court[1] for a final disposition. Ms. Wilson has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

Malinda Wilson (Plaintiff) applied for DIB and SSI in June 2006, alleging a disability since April 24, 2006, caused by bilateral spondyloloysis[2] of L5 with a Grade II-

---

[1]See 28 U.S.C. § 636(c).

[2]Spondyloloysis is "[d]egeneration or deficient development of the articulating part of a vertebra." Stedman's Medical Dictionary, 1656 (26th ed. 1995).

Grade III anterior spondylolisthesis.[3]  (R.[4] at 159-64.)  Following a hearing held in November 2008 after the initial denial of her applications, Administrative Law Judge (ALJ) Victor L. Horton held that Plaintiff was disabled as of March 6, 2006, until August 2, 2007, when a medical improvement occurred that ended her disability.  (Id. at 10-29, 31-118.)  The Appeals Council denied her request for review, effectively adopting the decision of the ALJ as the final decision of the Commissioner.  (Id. at 1, 3, 5.)

### Testimony Before the ALJ

Plaintiff, represented by counsel, and Brenda G. Young, a vocational expert (VE), testified at the administrative hearing.

Plaintiff testified that she was then 34 years old, married, and living by herself in a trailer on her mother's property. (Id. at 41-43,[5] 51, 91.)  She is 5 feet 3 inches tall and weighs 230 pounds.  (Id. at 51.)  She does not have any problems reading, writing, or doing arithmetic.  (Id.)  She lives on food stamps.  (Id.)  She receives Medicaid.  (Id. at 55.)

---

[3]Spondylolisthesis "is a condition of the spine whereby one of the vertebra slips forward or backward compared to the next vertebra."  MedicineNet.com, Spondyloisthesis, http://www.medicinenet.com/spondylolisthesis/article.htm (last visited Mar. 15, 2011).  Grade refers to "how much of a vertebral body has slipped forward over the body beneath it."  Mary Rodts, DNP, Spondylolisthesis:  Back Condition and Treatment, http://www. spineuniverse.com/conditions/spondylolisthesis/spondylolisthesis-back-condition-treatment (last visited Mar. 14, 2011).  A Grade II (2) spondylolisthesis refers to 50% of the body; Grade III (3) is 75%.  Id.

[4]References to "R." are to the administrative record filed by the Commissioner with his answer.

[5]Every other page of the transcript is blank.  For ease of reference, however, the Court will cite the beginning and ending pages without excluding the interim blank pages.

She has a twelfth grade education and some training as a certified nurse's aide and for medical billing. (<u>Id.</u> at 43.) For the latter, she attended classes for two to three hours in the morning and for two hours in the afternoon. (<u>Id.</u> at 43-45.) The training included practical experience; however, the number of hours she spent each day in the hospital medical records office depended on how she felt. (<u>Id.</u> at 45.) The classroom work began in August 2007, ended in March 2008, and was followed by the practical work until May 2008. (<u>Id.</u> at 47, 49.) When doing practical work, Fridays were still spent in the classroom. (<u>Id.</u> at 49.) She drove to school. (<u>Id.</u> at 47.)

She has a pending worker's compensation against Wal-Mart. (<u>Id.</u> at 53.) She last worked in April 2006 and was then on light-duty because of a March 11, 2006, injury. (<u>Id.</u> at 55.) She returned to work after her injury because the doctor Wal-Mart sent her to said she must have twisted something, gave her pain medication, and sent her back to work. (<u>Id.</u> at 67.) She tried therapy, but it made the pain worse. (<u>Id.</u> at 67-69.) After she returned to work, she got into trouble for singing over the intercom – which she did not realize she was doing because of the pain medication – and sleeping. (<u>Id.</u> at 69.) She was put on light duty, quit work in April, and has not worked since. (<u>Id.</u>)

Asked what currently prevents her from working, Plaintiff listed pain, muscle spasms, and difficulty driving, lifting, standing, and sitting. (<u>Id.</u> at 65.) It is hard for her to find something she can do. (<u>Id.</u>) Her dad drove her to the hearing. (<u>Id.</u>) When she does drive, she uses her mother's or boyfriend's car. (<u>Id.</u> at 89.)

Plaintiff has problems with her right foot. (Id. at 71.) She falls a lot when she goes up stairs. (Id.) She is supposed to get an orthotic. (Id. at 73.)

Plaintiff had a fusion in her back at the L-4/L-5 and S1 levels. (Id.) She wore a back brace for four to five weeks after the surgery. (Id.) For two to three months, she used a walker, then a four-prong cane for five to six months, and now a single cane. (Id. at 79, 83.) The cane is not prescribed by her doctor, nor did he say he wants her to use it. (Id. at 79.) The walker and four-prong cane had been recommended by the doctor at the hospital. (Id. at 81.) She had not used the cane for approximately six months until four months ago when she started using it again. (Id. at 83-85.)

Plaintiff can pick up five to ten pounds without pain depending on the way she lifts. (Id. at 73-75.) Other than the problems with her lower back and right foot, she does not have any problems. (Id. at 73.)

Plaintiff testified that she can walk two hours in an eight-hour day if it is not constant. (Id. at 75.) Her tolerance for sitting varies. (Id.) When she sits, she often has to change positions. (Id.) When she was doing her practical work, she could sit for twenty or thirty minutes. (Id. at 77.)

The medications Plaintiff takes include a muscle relaxer, Skelaxin or Darvocet; Neurontin for numbness; amitriptyline for muscle spasms; Cymbalta for muscle neuropathy and depression; and Singulair and Claritin for allergies. (Id. at 85.) The first four are for her back and foot. (Id. at 85-87.) Her medications make her sleepy. (Id. at 87.) She takes

her pain medication every four hours.  (Id.)  It causes her to be sleepy, so she takes a nap.
(Id.)

Plaintiff does not smoke, drink, or use illegal drugs.  (Id.)

An agency provides someone to help her do the light housekeeping and prepare some meals.  (Id. at 89.)  She can do some jobs such as vacuuming, mopping, sweeping, and the dishes, but has to shift her position.  (Id.)  She can cook something if it is quick and easy. (Id. at 91.)

Plaintiff has recently looked for part-time work doing medical billing.  (Id.)  She does not think she can work full-time because of her pain and spasms.  (Id.)

In her testimony, the VE described the jobs held by Plaintiff in terms of their exertional and skill levels.  (Id. at 97.)  The ALJ asked her if the following-described hypothetical person would be able to perform Plaintiff's past relevant work:

> [A]ssuming a hypothetical individual with the claimant's education, training, and work experience at the time of AOD [alleged onset of disability].  Further assume the individual can:  occasionally 20; frequently 10; stand and walk six hours out of eight; sit six hours out of eight; climb stairs and ramps occasionally; climb ropes, ladders and scaffolds never; balance, stoop, kneel, crouch occasional; crawl never.

(Id. at 99.)   The VE replied that this person could perform Plaintiff's past relevant work as a cashier and daycare provider.  (Id.)  If the person could lift and carry a maximum of ten pounds, stand for two, sit for six, and be otherwise limited as previously described, the person could not perform any of her past relevant work.  (Id.)  There were, however, jobs

the person could perform.  (Id.)  These jobs were in the sedentary[6] category and included jobs such as a customer service representative, telemarketer, and small products assembler.  (Id. at 99-101.)  The customer service job was semiskilled; the other two were unskilled.  (Id. at 101.)  If the hypothetical person also had to have a sit/stand option, all but some of the cashier jobs would be eliminated.  (Id.)  If the person also had to take at least four discretionary breaks in an eight-hour day, all the sedentary jobs she described would be eliminated.  (Id. at 103.)

Asked how many of the jobs she described were in the Rolla or Salem area, the VE testified that the number would "probably" be an eighth.  (Id.)

Asked about a hypothetical claimant who also had pain that interfered with her attention and concentration 34% to 66% of an eight-hour day to such an extent that the person would lose focus and stop working, the VE replied that this additional limitation would eliminate work.  (Id. at 105.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her applications, records from various health care providers, and an assessment of her physical residual capacity.

When applying for SSI and DIB, Plaintiff completed a Disability Report, listing her height as 5 feet 3 inches and her weight as 217 pounds.  (Id. at 189-96.)  Her ability to work

_____

[6]"Sedentary work involves lifting no more than 10 pounds at a time and occasional walking and standing."  20 C.F.R. § 404.1567(a).

is limited by bilateral spondyloloysis of L5 with a Grade II-Grade III[7] anterior spondylolisthesis, which causes her to be unable to bend, pull, push, stoop, and lift more than ten pounds. (Id. at 190.) She was on a medical leave of absence while she recovered from surgery and was to sit, stand, and walk as tolerated. (Id.) Her condition first bothered her on March 6, 2006, and caused her to be unable to work that same day. (Id.) She stopped working on April 26, 2006. (Id.)

A Function Report was completed on Plaintiff's behalf by her sister.[8] (Id. at 224-31.) Asked to describe what Plaintiff does during her waking hours, the response was that she puts on her back brace if it is not already on, takes care of her morning toiletry needs, has coffee and breakfast, rests and naps, eats lunch, rests and naps, has dinner, rests, and goes to bed. (Id. at 224.) She cannot cook because she cannot stand. (Id. at 225.) Her sister helps her bathe and with her grooming. (Id.) She can no longer do any household chores or yard work; her sister does them. (Id. at 226.) Her impairments affect her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and get along with others. (Id. at 229.) She cannot pay attention for longer than five minutes. (Id.) She cannot work because she is not mobile. (Id. at 231.)

---

[7]Grade refers to "how much of a vertebral body has slipped forward over the body beneath it." Mary Rodts, DNP, Spondylolisthesis: Back Condition and Treatment, http://www.spineuniverse.com/conditions/spondylolisthesis/spondylolisthesis-back-condition-treatment (last visited Mar. 14, 2011). A Grade II (2) spondylolisthesis refers to 50% of the body; Grade III (3) is 75%. Id.

[8]Plaintiff's sister completed two Function Reports. One was completed in her sister's stead and used the first person pronoun. The other was completed in the third person. The answers are similar; hence, only one will be cited.

Plaintiff completed a Disability Report – Appeal form after the initial denial of her applications. (Id. at 256-62.) Beginning in May 2006, she has problems with a loss of balance due to numbness in her leg. (Id. at 257.) Consequently, she has problems walking, standing, sitting, picking up items from the floor, and taking care of her personal hygiene. (Id. at 260.) She keeps falling down. (Id.)

Plaintiff's earnings report covered the years from 1992 through the first quarter of 2007, inclusive. (Id. at 168.) Her annual earnings in 2006 were $6,353.53. (Id.) The majority of her other annual earnings were consistently between $15,000 and $25,000. (Id.) in 1993.

The relevant medical records before the ALJ are summarized below in chronological order.

After injuring her back on March 11, 2006, Plaintiff consulted Faisal J. Albanna, M.D., on April 24 about pain in her low back and left lower extremity. (Id. at 508, 511-14.) A magnetic resonance imaging (MRI) and x-rays of her lumbosacral spine revealed spondylolisthesis Grade 3 with partial ptosis and marked disc degeneration of at L5-S1. (Id. at 508, 511.) Various treatment options were discussed. (Id. at 508.) He recommended a trial of one lumbar epidural steroid injection, which Plaintiff had on May 3. (Id. at 423, 508, 510.)

Plaintiff informed Dr. Albanna on May 8 that physical therapy[9] was aggravating her symptoms and the epidural steroid injection was not helping. (Id. at 419, 501, 507.) They discussed the various treatment options. (Id. at 419.)

Subsequently, on May 19, Plaintiff underwent an anterior lumbar interbody fusion at L4-L5, L5-S1. (Id. at 424-40, 471-93, 515-29..) She reportedly had an immediate, postoperative resolution of pain in her left lower extremity and numbness and tingling in her right lower extremity, which was subsiding. (Id. at 425.) She was ambulating with normal motor strength. (Id.) Plaintiff was discharged three days later and given a walker for support. (Id.) Her discharge diagnosis was spondylolisthesis, Grade 2-3, L5-S1; disc degeneration, L5-S1; spinal stenosis, L5-S1; lumbar spondylosis, L5-S1, and to a lesser degree, L4-L5; and L5 and S1 radiculopathy secondary to the lumbar pseudoarthrosis. (Id.) Her condition on discharge was "very good." (Id. at 426.)

At Plaintiff's June visit, Dr. Albanna noted that Plaintiff was walking with crutches and was no longer using a walker. (Id. at 418, 497, 506.) He asked that she use a four prong cane. (Id. at 418.) She was to begin physical therapy. (Id.)

On July 18, Dr. Albanna described Plaintiff as "doing exceptionally very well." (Id. at 417, 496, 505.) Her right leg was swollen, but there was no tenderness on palpation of either calf. (Id. at 417.) She was more limber and was using only a single prong cane. (Id.)

_____

[9]See R. at 537-41, 544.

She was to continue with the physical therapy.[10]  (Id.)  She required only Darvocet and Valium.  (Id.)

Dr. Albanna reported on August 29 that Plaintiff was doing very well overall.  (Id. at 416, 421.)  She was starting to ache more in her right foot and was still wearing her brace.  (Id. at 416.)  She was to wean herself from the brace.  (Id.)  She was more limber than ever before and could demonstrate a tiptoe and heel gait considerably better than before, albeit not well because she favored her right leg.  (Id.)  She presented with partial early right foot drop.  (Id.)  She was to continue her physical therapy, Darvocet, and Valium.  (Id.)  In his script for three sessions for four weeks of physical therapy, Dr. Albanna noted that Plaintiff was to discontinue use of the cane.  (Id. at 568.)

Plaintiff began physical therapy at Salem Memorial District Hospital on October 24.  (Id. at 565-67, 570, 579.)  She reported that she had fallen the day before, had fallen four times since her May surgery, and had increased numbness and swelling in her right leg.  (Id. at 566.)  Her pain was a five on a ten-point scale and was worse at night and when she was sleeping, laying down, driving, pushing, or pulling.  (Id.)  She did not carry anything over five pounds.  (Id.)  Her job limitations included lifting, climbing, and squatting.  (Id. at 567.)  Her recreational limitations included driving, shopping, and riding a four-wheeler.  (Id.)  She had decreased strength in her right lower extremity and a limited range of motion in her lumbar spine.  (Id.)  The goals included decreasing her pain to a three, normalizing

_____

[10]According to the medical records, Plaintiff did not *begin* physical therapy until that October.

her gait, and increasing the strength in her right lower extremity. (Id.) At her third session, on October 30, Plaintiff was able to increase her time on the treadmill from nine to fifteen minutes, although she was fatigued afterwards. (Id. at 572.) She was still using a cane, but explained that it was for safety. (Id.) At her fifth session, on November 3, Plaintiff was using her cane due to soreness and numbness in her right lower extremity. (Id. at 574.) The therapist questioned whether she was doing her home exercise program and encouraged her to do so three times a day and to wean herself from use of the cane. (Id.) Before her sixth visit, her sister called and cancelled her next three scheduled sessions; she did not give a reason. (Id. at 575.) Her sister said Plaintiff would call to reschedule. (Id.) Plaintiff did not show for the ninth and tenth scheduled sessions; she cancelled the eleventh, and last, session. (Id. at 565, 576-78.) On the discharge assessment form, the therapist noted that, because Plaintiff had attended only five of eleven scheduled appointments, consistent progress could not be shown. (Id. at 565.)

Plaintiff was described as being more limber and with a good range of motion in her lumbosacral spine when she returned to Dr. Albanna on November 8. (Id. at 415.) She continued to favor her right lower extremity, although her strength in that extremity was almost 5/5 compared to her left side. (Id.) Her sensory and motor examinations were intact; she was areflexic (without reflexes[11]) in her lower extremities. (Id.) She was given

---

[11]See Stedman's Medical Dictionary at 128.

a home exercise program and "strongly" encouraged to use the stationary bike. (Id.) Her prescriptions for Darvocet and Valium were renewed. (Id.)

When Dr. Albanna saw Plaintiff on February 6, 2007, her chief complaint was of right foot numbness. (Id. at 414, 420.) On examination, she slightly favored that foot, but could demonstrate a tiptoe and heel gait without difficulty, had intact sensory and motor exams, and was areflexic in her lower extremities. (Id. at 414.) X-rays of her lumbosacral spine showed the anterior and posterior fusion to be in satisfactory condition. (Id. at 414, 420.) Dr. Albanna told Plaintiff to use a stationary bicycle. (Id. at 414.)

Plaintiff saw Jimmy Bell, a family nurse practitioner with St. John's Physicians and Clinics (St. John's), on March 13 to establish care. (Id. at 603-04.) She complained of neuropathy from her right knee to her right foot, but had not tried any neuropathy agents. (Id. at 603.) At her next, March 24 visit she inquired about the results of blood work previously performed. (Id. at 600-02.) She next saw Mr. Bell on April 24 for the completion of her SSI disability papers.[12] (Id. at 598-99.) She complained of increased pressure to all areas and of back pain that was a seven on a ten-point scale. (Id.)

Plaintiff returned to Dr. Albanna's office in May. (Id. at 653-54, 656, 658, 660.) She was described as "doing very well." (Id. at 660.) He noted that her post-operative numbness in her right lower extremity had decreased. (Id. at 654.) He recommended that

---

[12]See pages 17 to18, below.

she do a range of motion and strengthening exercise program at home. (Id. at 654.) Darvocet was discontinued; Valium was continued, to be taken as needed. (Id.)

On June 25, Plaintiff returned to Mr. Bell with complaints of increased lumbar pain radiating to her right leg. (Id. at 596-97.) She "admit[ted] to over-activity." (Id. at 596.) She was prescribed Elavil in 50 milligram dosages. (Id.) In the next, undated note, Plaintiff reported that she was better and had no further spasms since starting to take Elavil; she continued to have extreme fatigue in the morning. (Id. at 594-95, 634-35.) She was to start school in August. (Id. at 594.) Her dosage of Elavil was reduced to half. (Id.)

Plaintiff reported to Dr. Albanna in July that she had pain in her right buttock to her posterior right thigh during increased activity and riding in the car. (Id. at 651-52.) She was walking ten minutes a day. (Id. at 651.) On examination, she had decreased flexion and extension in her lumbar spine and a normal left and right side bend and rotation, all without pain. (Id.) Her gait and station had a mild, antalgic gait; she moved slowly and with stiffness. (Id.) Her movement and posture displayed mild guarding of her lumbar spine. (Id.) She was able to walk on her heels and toes without difficulty. (Id.) Her straight leg raises were negative on both sides in both the sitting and supine positions. (Id.) She had a full range of motion and areflexia in both extremities. (Id.) She was to participate in a physical therapy program, three times a week for four weeks, and a home exercise program. (Id. at 652.) She was prescribed 800 milligrams of ibuprofen to be taken twice a day with food. (Id.)

Plaintiff complained of frontal headaches and lumbar pain when she saw Mr. Bell on September 24.  (Id. at 632-33.)  She was tender to the touch.  (Id. at 633.)  She was prescribed a tapered course of prednisone, Skelaxin, and Synthoid.[13]  (Id. at 632.)

Plaintiff reported on December 12 that she continued to need pain medication.  (Id. at 630-31.)  Her worst problem was spasms in her lower right leg.  (Id. at 630.)  She was prescribed Neurontin, Darvocet, Soma, and Ceftin (for bronchitis).  (Id.)

On January 8, 2008, Plaintiff told Mr. Bell that the Neurontin dose was too strong, but the Skelaxin worked well.  (Id. at 628-29.)  She complained of swelling in both lower extremities and was given two pairs of compression knee-high hose.  (Id. at 628.)  The dosage of Neurontin was changed; the Skelaxin was continued; the Darvocet was renewed.  (Id.)

Plaintiff reported on March 3 that her lumbar pain was exacerbated by the weather.  (Id. at 626-27.)  She also had frontal pain and pressure.  (Id. at 626.)  The Skelaxin was discontinued; Darvocet and Ceftin were refilled; Soma was restarted.  (Id.)  The following month, Plaintiff told Mr. Bell that she had been having "extreme" muscle cramps and spasms during the day since starting a new job.[14]  (Id. at 624-25.)  The pain was a seven on a ten-point scale or, with pain medication and rest, a four.  (Id. at 624.)  Plaintiff had been taking Skelaxin and Soma and wanted to stop the latter.  (Id.)  On May 16, Plaintiff reported

---

[13]The name of another medication is illegible.

[14]Plaintiff explained at the hearing that the job referred to was the practical portion of her medical billing training.

that her pain was a two due to recent changes in her medication and was only in her lumbar area. (Id. at 620-21.) On July 29, she described her pain as a four when on medication. (Id. at 616-17.) She was having a problem with depression and extreme mood swings. (Id. at 616.) Cymbalta was prescribed. (Id.)

Shortly after her May visit to Mr. Bell, on May 29, Plaintiff saw Dr. Albanna. (Id. at 648-49, 655, 659.) He summarized her chief complaint as follows:

> This patient presents today for follow-up evaluation of low back pain. Back pain is located in the lower lumbar area. Pain radiates to the bilateral legs. She had been feeling well until several weeks ago she was sitting and driving more than usual and has increased pain in back and legs. She also complains of intermittent numbness and tingling in bilateral legs. The patient's main occupation is a student. The patient has difficulty with driving, getting in and out of a car and sitting. Patient is very functional and content with her progress.

(Id. at 648.) He described Plaintiff's health status as "good" and noted that her pain disrupted her daily activities. (Id.) She "appear[ed] content and pleased with her progress from her former surgery, cooperative, overweight, pleasant and motivated." (Id.) Her appearance had improved since her last visit; her mood and affect were normal. (Id.) She reported mild pain. (Id.) On examination, Plaintiff had evidence of muscle tension and stiffness in her back. (Id. at 649.) In her lumbar spine, she had decreased flexion and extension without pain. (Id.) She also had a normal left and right side bend and rotation, without pain. (Id.) Her gait and station were normal with the exception of being stiff. (Id.) Her movement and posture displayed mild guarding of her lumbar spine. (Id.) She was able to walk on her heels and toes without difficulty. (Id.) Her straight leg raises were

negative on both sides.  (Id.)  Her neurologic exam was "grossly intact."  (Id.)  Her coordination was good.  (Id.)  She had areflexia in her lower extremities.  (Id.)  Touch, pin, vibratory and proprioception sensations were normal.  (Id.)  X-rays of her lumbar spine revealed a "satisfactory" anterior lumbar interbody fusion at L4-L5 and L5-S1 and a reduction of spondylolisthesis.  (Id. at 649, 659.)  Dr. Albanna discussed with Plaintiff "that her recovery will take an extensive period of time possibly years, the possibility of moderate chronic pain with exertional activities and that her symptoms are stable and responding to conservative treatment."  (Id. at 649.)  He recommended a weigh reduction program and home exercise.  (Id.)  He concluded that she was "doing excellent" and was "much improved."  (Id.)  He "anticipate[d] steady improvement."  (Id.)

On August 6, Plaintiff consulted a podiatrist about problems with her right toe nail.  (Id. at 644-45.)  Her relevant diagnoses included neuropathy in her right leg.  (Id. at 644.)

After cancelling two appointments, Plaintiff saw Mr. Bell in September for complaints of a worsening problem with gastroesophageal reflux disease (GERD) and a resolving problem with mouth sores.  (Id. at 757-58.)  She had paperwork to be completed for her SSI application.[15]  (Id. at 757.)

---

[15]See pages 18 to 19, below.

The ALJ also had before him the report of an assessment by a non-examining, non-medical consultant, two assessments by Mr. Bell, and documents relating to Plaintiff's pursuit of vocational rehabilitation.[16]

In August 2006, a Physical Residual Functional Capacity Assessment (PRFCA) was completed by a non-medical consultant as part of the application review process. (Id. at 550-55.) The primary diagnosis, and only, diagnosis was degenerative disc disease and spondylolisthesis of the lumbar spine. (Id. at 550.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally lift or carry fifty pounds; frequently lift or carry twenty-five pounds; and stand, walk, or sit about six hours in an eight-hour day. (Id. at 551.) Her ability to push or pull was unlimited other than these lifting and carrying restrictions. (Id.) She had no postural, manipulative, visual, communicative, or environmental limitations. (Id. at 552-54.)

In April 2007, Mr. Bell answered a Physical Residual Functional Capacity Questionnaire on behalf of Plaintiff. (Id. at 589-93.) He answered "April 11, 2006," when asked about the frequency and length of contact. (Id. at 589.) The diagnosis was lumbar pain with radiculopathy. (Id.) The daily pain was a six on a ten-point scale and had associated numbness in the lower half of her right leg. (Id.) She had problems with forward flexion, lifting, walking farther than 100 feet, and prolonged driving. (Id.) Her

_____

[16]Also before the ALJ was Plaintiff's personnel file from Wal-Mart and her pharmacy records from Wal-Mart. (Id. at 265-350, 352-66.) Relevant information from those documents appears elsewhere in the record.

impairments could be expected to last at least twelve months. (<u>Id.</u>) Plaintiff was not a malingerer. (<u>Id.</u> at 590.) Emotional factors did not contribute to the severity of her symptoms and functional limitations, although she did have depression. (<u>Id.</u>) Her pain was severe enough during a typical workday to frequently interfere with her attention and concentration. (<u>Id.</u>) She could tolerate moderate stress. (<u>Id.</u>) Her pain could be controlled with medication. (<u>Id.</u>) She could sit or stand for no longer than thirty minutes before having to change positions. (<u>Id.</u>) She could sit, stand, or walk for less than two hours in an eight-hour workday with normal breaks. (<u>Id.</u> at 591.) During such a day, Plaintiff would have to walk every thirty minutes for three minutes. (<u>Id.</u>) She did *not* need a job that permitted her to shift positions at will, but she would need to take three to four, five-minute breaks. (<u>Id.</u>) When standing or walking, she did not need a cane or other assistive device. (<u>Id.</u>) She could frequently lift less than ten pounds. (<u>Id.</u>) She could rarely twist, stoop, crouch, squat; occasionally climb stairs; and never climb ladders. (<u>Id.</u> at 592.) She was likely to be absent more than four days a month. (<u>Id.</u>) She had no other limitations. (<u>Id.</u>)

In September 2008, Mr. Bell answered a second Physical Residual Functional Capacity Questionnaire on behalf of Plaintiff. (<u>Id.</u> at 764-68.) The diagnosis was lumbar pain; the prognosis was "guarded." (<u>Id.</u> at 764.) Plaintiff reportedly had an aching pain that was almost constant and was a nine on a ten-point scale. (<u>Id.</u>) She had a drop foot diagnosis by a podiatrist. (<u>Id.</u>) Her medications caused drowsiness. (<u>Id.</u>) Her impairments could be expected to last at least twelve months. (<u>Id.</u>) Plaintiff was not a malingerer. (<u>Id.</u> at 765.) Emotional factors *did* contribute to the severity of her symptoms and functional

limitations; she had depression.  (Id.)  Her pain was severe enough during a typical workday to frequently interfere with her attention and concentration.  (Id.)  She could tolerate moderate stress.  (Id.)  She could not walk farther than one block without rest or severe pain.  (Id. at 765.)  She could not sit for longer than twenty minuets or stand for longer than thirty minutes before having to change positions.  (Id.)  She could sit, stand, or walk for about four hours in an eight-hour workday with normal breaks.  (Id. at 766.)  During such a day, Plaintiff would have to walk every thirty minutes for five minutes.  (Id.)  She needed a job that permitted her to shift positions at will and would need to take two unscheduled five-minute breaks each day.  (Id.)  When standing or walking, she did not need a cane or other assistive device.  (Id.)  She could frequently lift ten pounds.  (Id.)  She should never twist or climb ladders or stairs.  (Id. at 767.)  She could only rarely crouch or squat.  (Id.)  She could frequently stoop or bend.  (Id.)  She had no limitations with reaching, handling, or fingering.  (Id.)  She was *not* likely to be absent due to her impairments or treatment.  (Id.)  She "need[ed] to find a job that is within her physical capacity."  (Id.)

Documents from the State of Missouri Division of Vocational Rehabilitation include a March 2007 notation from a counselor concluding that Plaintiff's vocational goal of medical secretary was appropriate for her spondylolisthesis and related impairments and approved her for financial assistance for a six-week computer course and then enrollment in a program at Rolla Technical Institute to become a  medical secretary.  (Id. at 721-22.)  In February 2008, the counselor wrote Plaintiff that the Division was ready to assist her "in planning for services [she] may need to achieve a positive employment outcome."  (Id. at

65.)  The next month, Plaintiff reported that she thought she had an internship at a hospital and hoped the internship would result in employment after her graduation in May.  (<u>Id.</u> at 673.)  In July, she was referred for a job opening at the Rolla Medical Group.  (<u>Id.</u> at 667-68.)  The same month, she informed a counselor that she had several employment applications pending.  (<u>Id.</u> at 669, 672.)

Included in the Division records, see pages 667 to 753, were Plaintiff's attendance reports from the Rolla Technical Institute.  She began classes on August 14, 2007, and was absent one day that month.  (<u>Id.</u> at 748, 749.)  She stayed late another day to make up the time.  (<u>Id.</u>)  In September, October, November, and December, she was absent one day each month.  (<u>Id.</u> at 739, 742, 745, 746.)  In January 2008, she missed two days.  (<u>Id.</u> at 737.)  In February through May, she had 100% attendance.  (<u>Id.</u> at 729-36.)

### The ALJ's Decision

Because the question was whether Plaintiff's disability continued through the date of the decision, December 12, 2008, the ALJ followed the Commissioner's eight-step evaluation process for her Title II claim, see 20 C.F.R. § 404.1594, and seven-step evaluation process for her Title XVI claim, see 20 C.F.R. § 416.994.  Whether she was engaged in substantial gainful activity was not an issue in her Title XVI claim and was answered in the negative for her Title II claim.  (<u>Id.</u> at 16, 18.)  The next question was whether she had an impairment or combination thereof that met or equaled an impairment of listing-level severity.  (<u>Id.</u> at 16.)  The ALJ found that Plaintiff had severe impairments of bilateral spondylolysis at L5 with Grade II to Grade III anterior spondylolisthesis; status-

post anterior lumbar interbody fusion; foraminotomy and decompressive lumbar microlaminectomy at L4-L5-S1; and partial reduction of spondylolisthesis at L4-L5-S1. (<u>Id.</u> at 18.) Her depression was not a severe impairment. (<u>Id.</u> at 23.) It did not result in any restrictions in her activities of daily living or in any difficulties in her social functioning or concentration, persistence, or pace. (<u>Id.</u>) It resulted in no episodes of decompensation. (<u>Id.</u>) Beginning on August 2, 2007, her severe impairments did not, singly or in combination, equal an impairment of listing-level severity. (<u>Id.</u> at 22.) As of that date, medical improvement had occurred and was related to her ability to work. (<u>Id.</u> at 22, 27.)

Plaintiff then had the residual functional capacity (RFC) to perform the full range of sedentary work except she could not lift or carry more than ten pounds; stand and walk for more than a total of two hours in an eight-hour day; sit for more than a total of six hours in an eight-hour day; and do more than occasional climbing of stairs and ramps, balancing, stooping, kneeling, and crouching. (<u>Id.</u> at 24.) She should never crawl or climb ropes, ladders, or scaffolds. (<u>Id.</u>)

When assessing Plaintiff's RFC, the ALJ considered her credibility. He found her statements about the intensity, persistence, and limiting effects of her impairments to be not credible to the extent that they were inconsistent with the RFC, noting that they were not entirely supported by the medical evidence, that there was no report of the complained-of side effects to her physicians, that she was able to complete her course work, in which she had As, with a good record of attendance, and that she was never found to require the prolonged use of a cane. (<u>Id.</u> at 26-27.)

With her RFC, however, Plaintiff could not return to her past relevant work. (Id. at 27.) With her RFC, age, education, and work experiences, she could perform the jobs described by the VE. (Id. at 28.) Consequently, she was not disabled as of August 2, 2007, within the meaning of the Act. (Id. at 28.)

## Discussion

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

For Title II claims, the process for determining whether a claimant's disability has ceased involves eight steps. **Dixon v. Barnhart**, 324 F.3d 997, 1000 (8th Cir. 2003). The eight steps are:

> (1) whether the claimant is currently engaging in substantial gainful activity, (2) if not, whether the disability continues because the claimant's impairments meet or equal the severity of a listed impairment, (3) whether there has been a medical improvement, (4) if there has been medical improvement, whether it is related to the claimant's ability to work, (5) if there has been no medical improvement or if the medical improvement is not related to the claimant's ability to work, whether any exception to medical improvement applies, (6) if there is medical improvement and it is shown to be related to the claimant's ability to work, whether all of the claimant's current impairments in

combination are severe, (7) if the current impairment or combination of impairments is severe, whether the claimant has the residual functional capacity to perform any of his past relevant work activity, and (8) if the claimant is unable to do work performed in the past, whether the claimant can perform other work.

**Id.** at 1000-01 (citing 20 C.F.R. § 404.1594(f)). For Title XVI claims, the last seven questions must be addressed. See 20 C.F.R. § 416.994.

The regulations define medical improvement as

[a]ny decrease in the medical severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] [was] disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the claimant's] impairment(s).

20 C.F.R. § 416.994(b)(1)(I). Medical improvement can be found in cases involving the improvement of a single impairment if that improvement increases the claimant's overall ability to perform work related functions. 20 C.F.R. § 416.994(c)(2). "Whether a claimant's condition has improved is primarily question for the trier of fact . . . ." **Muncy v. Apfel**, 247 F.3d 728, 735 (8th Cir. 2001).[17]

Plaintiff argues that the ALJ erred in finding that she no longer continued to be disabled under the Act as of August 2, 2007. Specifically, the ALJ failed to (a) properly consider the opinions of Mr. Bell when evaluating his RFC and to contact Dr. Albanna to

---

[17]The Court notes that the Eighth Circuit held in **Muncy**, 247 F.3d at 734, that the question is also "generally determined by assessing witnesses' credibility." However, Plaintiff does not challenge the ALJ's assessment of her credibility.

solicit a medical basis for her RFC and (b) properly consider her diagnoses of neuropathy, areflexia, and an unchanged Grade II anterolisthesis.

Plaintiff's RFC. The ALJ found that Plaintiff had the RFC to perform sedentary work except she could not lift or carry more than ten pounds; stand and walk for more than a total of two hours in an eight-hour day; sit for more than a total of six hours in an eight-hour day; do more than occasional climbing of stairs and ramps, balancing, stooping, kneeling, and crouching; and never do any crawling or climbing of ropes, ladders, or scaffolds. This RFC is less restrictive than either of the RFC assessments of Mr. Bell. In his April 2007 assessment, he concluded that Plaintiff could sit, stand, or walk for less than two hours in an eight-hour workday with normal breaks. In his September 2008 assessment, he concluded that she could sit, stand, or walk for less than four hours in an eight-hour workday with normal breaks. In his first assessment, he found that she did not need to shift positions at will, but would need to take three to four five-minute breaks. In his second assessment, he found that she had to shift positions at will and needed two five-minute breaks. He first found she was likely to be absent more than four days a month; he later found she would not be absent.

"[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of [her] limitations.'" **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009) (quoting Lacroix v. Barnhart, 465 F.3d 881, 887 (8th Cir. 2006)). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the

record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In the instant case, the ALJ did not err in not deferring to Mr. Bell's RFC assessments because, first, he is not "an acceptable medical source," see 20 C.F.R. §§ 404.1513(a), 416.923(a) (excluding nurse practitioners from list of acceptable medical source), and, therefore, his opinions are not entitled to controlling weight.  <u>See</u> **Lacroix**, 465 F.3d at 885-86.  Second, his assessments are not supported by the record.

Citing **Shontos v. Barnhart**, 328 F.3d 418 (8th Cir. 2003), Plaintiff argues that, regardless of his status as a nurse practitioner, Mr. Bell's opinions should be given greater weight because he was a member of a treatment team.  The court in **Shontos** noted that the regulations require that a nurse practitioner be considered a "other" medical source with evidence relevant to the severity of a claimant's impairment and the effect of the impairment on her ability to work.  **Id.** at 426.  The ALJ specifically held that he was considering Mr. Bell's reports in such a context.  <u>See</u> R. at 26.

The court also held that the ALJ erred in discounting the opinions of the claimant's mental health providers who, although not acceptable medical sources, were active participants in a team approach to the mental health care, including being seen by certified counselor forty-nine times during a fifteen-month period and by a nurse practitioner intermittently.  **Id.** at 426.  The team also included an acceptable medical source, a clinical

psychologist, who gave an opinion consistent with that of the nurse practitioner and therapist. **Id.** at 421-22.

In **Lacroix**, the court distinguished **Shontos** on the basis that the record before it did not include a report by an acceptable medical source and none of the reports by the nurse practitioner refer to a doctor's participation. 465 F.3d at 886. Plaintiff contends that one notation of "reviewed - ok" by a doctor on Mr. Bell's treatment notes and his referral of her to a doctor for a pap smear establish that he was a member of a treatment team. Participation is "the action or fact of having or forming part *of* something; the sharing *of* something." Oxford English Dictionary, http://www.oed.com/view/Entry/138245?redirectedFrom=participation# (last visited Mar. 14, 2011). A team is "[a] number of persons associated in some joint action . . . a group collaborating in their professional work . . . ." Id. at http://www.oed.com/view/Entry/198373?rskey=js3wg1&result=1&isAdvanced=false#. There is nothing in the record to show that the doctor who once okayed Mr. Bell's treatment of Plaintiff ever *participated* in that treatment. Nor does a referral to another doctor reflect the existence of a treatment *team*. Indeed, there is no evidence that anyone at St. John's other than Mr. Bell treated Plaintiff. Rather, as noted by the Commissioner, Dr. Albanna was the physician who treated Plaintiff for her impairments at issue. Dr. Albanna never imposed any restrictions on Plaintiff that are inconsistent with or greater than those captured in the ALJ's RFC.[18]

---

[18]Plaintiff correctly notes that Dr. Albanna cautioned her that her recovery would take "an extensive period of time" and that she might have "moderate chronic pain with exertional activities."

- 26 -

Additionally, regardless of whether Mr. Bell is an acceptable medical source, his two assessments lack support in the record. See **Tilley v. Astrue**, 580 F.3d 675, 680 (8th Cir. 2009) ("A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record.'") (quoting 20 C.F.R. § 404.1527(d)(2)) (alteration in original); accord **Halverson v. Astrue**, 600 F.3d 922, 929 (8th Cir. 2010); **Davidson v. Astrue**, 578 F.3d 838, 842 (8th Cir. 2009). His first assessment was completed after Plaintiff's third visit.[19] Her first visit was to establish care; she complained of neuropathy but had not tried any neuropathy agents. The second was to check on her blood work. The third was to have the assessment completed. Based on these three cursory visits, Mr. Bell concluded that Plaintiff's pain was so severe that it would frequently interfere with her attention and concentration. At this time, Plaintiff had just finished a computer training course and was beginning a medical secretary training program, in which her grades were consistently As. He concluded that she was likely to be absent four days. Plaintiff went on to complete a training program where, when she was absent once a month, she was able to make up the time. The exertional limitations of sitting, standing, and walking were clearly based on Plaintiff's statements.

(R. at 649.) Regardless, he imposed no restrictions on her, including precluding her from exertional activities, and consistently observed that Plaintiff was doing well and continuing to improve.

[19]Plaintiff states that Mr. Bell had been treating her since April 2006. Although this is the date he listed on the assessment, there are no records of her seeing him until March 2007, when she went to him to *establish* care.

Mr. Bell's second assessment was again based on Plaintiff's descriptions and not on his own observations. For instance, her pain was reported to be so severe as to interfere with her attention and concentration. She had completed the medical secretary training program and had been looking for work in her field. Also, this second assessment was completed four months after he had last seen her. She had cancelled two interim appointments and had returned for unrelated problems and completion of the assessment. The most recent treatment she had had for her impairments at issue had been by Dr. Albanna. He, her treating physician, had not placed any restrictions on her. See **Young v. Apfel**, 221 F.3d 1065, 1069 (8th Cir. 2000) ("We find it significant that no physician who examined Young submitted a medical conclusion that she is disabled and unable to perform any type of work.").

For the foregoing reasons, the ALJ did not err when declining to give Mr. Bell's assessments controlling weight. See **Clevenger v. SSA**, 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes); **Randolph v. Barnhart**, 386 F.3d 835, 840 (8th Cir. 2004) (finding that the ALJ properly refused to give treating physician's opinion controlling weight when that opinion was in a checklist format and was given after physician had met with claimant only three times); **Hilkemeyer v. Barnhart**, 380 F.3d 441, 446 (8th Cir. 2004) (holding that "the ALJ was justified in rejecting diagnoses of other mental disorders by sources who conducted a single examination of [claimant], and whose conclusions seemed to be based solely upon her subjective complaints").

Plaintiff also argues that the ALJ erred by not contacting Dr. Albanna to inquire if he would place any restrictions on her. "The ALJ does not 'have to seek additional clarifying statements from a treating physician unless a *crucial issue* is undeveloped.'" **Vossen v. Astrue**, 612 F.3d 1011, 1016 (8th Cir. 2010) (quoting <u>Stormo v. Barnhart</u>, 377 F.3d 801, 806 (8th Cir. 2004)). A crucial issue was not undeveloped; rather, it was resolved unfavorably to Plaintiff. <u>See e.g.</u> **Steed v. Astrue**, 524 F.3d 872, 876 (8th Cir. 2008) (finding that claimant's failure to provide medical evidence supporting her allegations of work limitations "should not be held against the ALJ when there *is* medical evidence that supports the ALJ's decision"); **Samons v. Astrue**, 497 F.3d 813, 819 (8th Cir. 2007) (finding ALJ need not have contacted claimant's treating physician after finding that physician's opinion was inadequate to establish disability when the opinion was not inherently contradictory or unreliable).

<u>Plaintiff's Areflexia, Neuropathy, and Anterolisthesis.</u> Dr. Albanna diagnosed Plaintiff with lumbar spondylolisthesis, myofascial pain, lumbago, and status post lumbar fusion and microdiscectomy. Mr. Bell diagnosed Plaintiff with lumbar pain with radiculopathy. Plaintiff sought DIB and SSI on the basis of bilateral spondyloloysis of L5with a Grade II-Grade III anterior spondylolisthesis. She now argues that the ALJ erred by not addressing her impairments of areflexia, neuropathy, and Grade II anterolisthesis.

When examining Plaintiff, Dr. Albanna consistently found that she had areflexia in both lower extremities. The Commissioner argues that this is a sign of her spondylolisthesis. The Court agrees.

"Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from [the claimant's] statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. §§ 404.1528(b), 416.928(b). Plaintiff's areflexia was a physiological abnormality observed when Dr. Albanna examined Plaintiff in the course of treating her for her diagnosed back problems.

"Symptoms are [a claimant's] own description of [her] physical or mental impairment." 20 C.F.R. §§ 404.1528(a), 416.928(a). When first consulting Mr. Bell, Plaintiff complained to him of neuropathy in her right lower extremity. His impression of right lower extremity neuropathy is clearly an echo of that complaint. With the exception of the podiatrist's notes, the term "neuropathy" appears nowhere else in the medical records. Evaluation of those records as a whole, including Mr. Bell's subsequent diagnoses, clearly indicates that Plaintiff was describing a symptom to Mr. Bell.

X-rays of Plaintiff's lumbar spine taken in May 2006 indicated "Grade I-II anterolisthesis at L5-S1 with post-op fusion changes." (R. at 522.) "In anterolisthesis, the upper vertebral body is positioned abnormally compared to the vertebral body below it. More specifically, the upper vertebral body slips forward on the one below." Cedars-Sinai: Anterolisthesis, http://www.cedars-sinai.edu/Patients/Health-Conditions/ Anterolisthesis.aspx (last visited Mar. 15, 2011). Anterolisthesis is a more specific term for spondylolisthesis reflecting a forward slippage; a backward slippage is referred to as retrolisthesis. See MedicineNet.com, Spondylolisthesis, http://www.medicinenet.com/

spondylolisthesis/article.htm (last visited Mar. 15, 2011).  It is not an impairment separate and apart from spondylolisthesis, which the ALJ addressed at length.

**Conclusion**

The Commissioner's decision that Plaintiff was no longer disabled as of August 2, 2007, is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'"  **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  Considering both the evidence that supports the ALJ's decision and evidence that fairly detracts from that decision, see **Finch**, 547 F.3d at 935, the Court finds that the Commissioner's decision is so supported.  "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have supported a contrary outcome or [if this Court] would have decided the case differently."  **Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted).  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.



/s/ Thomas C. Mummert, III

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  15th  day of March, 2011.